IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
AT KANSAS CITY, KANSAS

| | |
|---|---|
| PAULETTA JOHNSON, mother of AMARREE'YA HENDERSON, Deceased | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| THE UNIFIED GOVERNMENT OF WYANDOTTE COUNTY and KANSAS CITY, KANSAS, the KANSAS CITY, KANSAS POLICE DEPARTMENT, Serve at: Unified Government Clerks' Office Municipal Office Building Room 323 701 North 7th Street Kansas City, Kansas 66101 | ) ) ) ) ) ) ) ) ) |
| And | ) ) |
| AUSTIN SCHULER Serve at: City Hall 701 N. 7th Street, Suite 961 Kansas City, KS 66101 | ) ) ) ) ) ) |
| Defendants. | ) |

## PLAINTIFF'S COMPLAINT

Plaintiff, Pauletta Johnson, on behalf of the estate of Decedent, Amarree'ya Henderson states and alleges the following in support of the causes of actions against Defendants, the Unified Government of Wyandotte County and Kansas City, Kansas, the Kansas City, Kansas Police Department, and Austin Schuler.

## PARTIES

1. Plaintiff, Pauletta Johnson, is the mother of the Decedent, Amarree'ya Henderson,

and resident of Kansas City, Missouri.

2. Defendant Austin Schuler (hereinafter referred to as "Defendant Schuler") was at all relevant times mentioned herein a duly sworn and active law enforcement officer for the City of Kansas City, Kansas Police Department. At all times mentioned herein, Defendant Schuler was acting under the color of state law pursuant to statutes, ordinances, regulations, policies, customs, and using of City of Kansas City, Kansas and its successor the Unified Government of Wyandotte County and Kansas City, Kansas as well as the State of Kansas. At all times relevant Defendant Schuler was acting within the course and scope of his employment with the Kansas City, Kansas Police Department. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

3. Defendant Kansas City, Kansas Police Department (hereinafter referred to as "Defendant KCKPD") is a law enforcement agency acting through its constituent, the Unified Government of Wyandotte County, Kansas and City of Kansas City, Kansas. Defendant KCKPD is located in Wyandotte County, Kansas. Defendant KCKPD has policymaking authority regarding the Kansas City, Kansas Police Department, and responsibility for the administration of activities and services of the Kansas City Police Department. In addition, the Defendant KCKPD carries out the policies established by the Unified Government. At all relevant times Defendant KCKPD was the public employer of Defendant Schuler.

4. Defendant Unified Government of Wyandotte County and Kansas City, Kansas (hereinafter referred to as "Defendant UG") is the successor of the municipality, the City of Kansas City, Kansas. The UG was created by and established under the law of the State of Kansas in 1997. It is authorized to sue and be sued in its own name. Its headquarters is located at 701 N. 7th Street, Kansas City, Kansas. The City of Kansas City, Kansas is a subdivision of the Unified Government and is located within Wyandotte County. The UG oversees the administration of

the KCKPD which includes developing, revising, and enforcing policies, allocating resources, and ensuring efficient operation of the department. It appoints and supervises police chiefs and those who play a crucial role in shaping the department and enforcing policies. At all relevant times Defendant UG was the public employer of Defendant Schuler.

## VENUE AND JURISDICTION

5.   Venue is proper in this Court pursuant to 28 U.S.C.A. § 1391(b) and (e) as the events and/or acts and/or omissions giving rise to this Complaint occurred in Wyandotte County, Kansas, which lies within the District of Kansas, and because Defendants were performing their respective duties and responsibilities within the District of Kansas.  Additionally, the parties reside, or, at the time the events took place, resided in this judicial district.

6.   This Court has jurisdiction over Plaintiff's federal constitutional claims pursuant to 42 U.S.C. § 1983, 28 U.S.C. §§ 1343, 1331, 1332 and the 4th and 14th Amendments to the Constitution of the United States.  This Court also has jurisdiction pursuant to 42 U.S.C. §1988 to award and allocate attorney fees which are specifically requested in Plaintiff's prayer for relief.

## FACTS COMMON TO ALL COUNTS

7.   At the time of the shooting described herein, Amarree'ya Henderson was a twenty-five (25) year-old African American male who worked as a delivery driver for DoorDash in addition to his job at Valvoline.  Amarree'ya Henderson had picked up extra DoorDash trips during the NFL Draft week to earn enough money for his upcoming May household bills and to assist his mother with her monthly expenses.

8.   Mr. Henderson's coworkers describe him as a friendly, kind, uplifting person—a great colleague who never caused any problems, and who never got angry with staff or customers.  Had Mr. Henderson lived, his next promotion would have been to store management.

9. Mr. Henderson's former teachers and administrations describe him as a student who was always respectful, and who stayed out of trouble despite being enrolled at the one of toughest high schools in the Kansas City Public Schools district. As a schoolwide servant leader, Henderson had also earned the Presidential Service Award for Community Service. Mr. Henderson, a four-year Army ROTC unit member who wore his uniform with pride and had been promoted from Private to First Sergeant while receiving several commendations, had once dreamed of becoming a police officer.

10. On April 26, 2023, Mr. Henderson, accompanied by his girlfriend, Shakira Hill, with whom he shared an apartment, was driving for DoorDash and had just dropped off Chinese food on his last delivery of the evening to a residence located in Kansas City, Kansas. Just prior to his last food delivery, Mr. Henderson had stopped by his mother's home for a brief visit with her and to play with his two-year-old nephew.

11. On the evening of April 26, 2023, Defendant Schuler, acting as an agent of the City of Kansas City, Kansas, the Kansas City Kansas Police Department, and the Unified Government of Wyandotte County, turned on his lights and stopped Mr. Henderson in the area of 1127 Metropolitan, just past the 12th Street Bridge that crosses the Kansas River in the Argentine neighborhood. Mr. Henderson pulled over to the right of the roadway and came to a complete stop.

12. Mr. Henderson was unarmed, and asked his girlfriend, Ms. Hill, to call his mother, Plaintiff Pauletta Johnson, on FaceTime at or about the time the stop by Defendant Schuler was initiated. Once connected, Pauletta Johnson, watched and listened during the traffic stop.

13. Defendant Schuler approached Mr. Henderson at the driver's side window, and

Mr. Henderson had already begun rolling down the rear driver's side window to advise Defendant Schuler that the driver's window was broken and would not roll down.

14. Mr. Henderson and Ms. Hill were wearing their seatbelts. Mr. Henderson provided his driver's license, registration, and used his phone to show insurance information.

15. Defendant Schuler went back to his patrol car and began writing a traffic citation. Upon information and belief, the citation was to be for an expired tag.

16. While seated in his patrol car writing the citation, additional KCKPD officers arrived on the scene and Defendant Schuler stopped writing, placed the citation book on his dashboard and exited the vehicle. Defendant Schuler and the other officers approached Mr. Henderson's vehicle.

17. Defendant Schuler chose to escalate a traffic stop for, upon information and belief, an expired tag. Even though it was dusk, Defendant Schuler began shining a flashlight into the eyes of the driver, Mr. Henderson and his front passenger, Ms. Hill.

18. Defendant Schuler never announced the reason for the traffic stop despite him having approached Mr. Henderson's vehicle a second time.

19. Defendant Schuler flung the driver's side door open and demanded that Mr. Henderson get out of the vehicle. Based on information and belief, Defendant Schuler intended to wrestle Mr. Henderson from his vehicle. Mr. Henderson became frightened by the obvious and unnecessary escalation of the traffic stop and attempted to drive away from Defendant Schuler to safety.

20. Defendant Schuler, with the driver's door still open as the vehicle started to move away from him, jumped onto the doorframe of Mr. Henderson's vehicle with both feet, holding onto the open door with one arm and the roof of the car with the other.

21. Defendant Schuler, realizing the danger in which he had placed himself by jumping onto a moving vehicle, then unholstered his service weapon and proceeded to blindly fire two shots into the vehicle and into the left side of Mr. Henderson's face and his left arm at close range.

22. Immediately after the shots were fired by Defendant Schuler, Mr. Henderson's vehicle veered to the right and crashed into an SUV parked on the street in front of a residence approximately four houses down from where the initial traffic stop began.

23. Defendant Schuler failed to adhere to KCKPD policies regarding Use of Force, and failed to implement de-escalation training and techniques, which were designed to instruct officers how to de-escalate and diffuse situations during traffic stops based on a Force Continuum.

24. As per the KCKPD website, "recruits graduating from the Kansas City, Kansas Police Academy receive in-depth use of force training and de-escalation techniques. That training is updated and reinforced each year during the department's mandatory in-service trainings.

25. KCKPD modified its policies in 2021, aligning them with the *[8 Can't Wait](#)* movement launched by Campaign Zero after the beating death of George Floyd by members of the Minneapolis Police Department. KCKPD's website touts that it is "one of only a handful of agencies within the State of Kansas that are compliant with *8 Can't Wait*."

26. The KCKPD "adheres to a Force Continuum as well as the "One Plus One" theory of use of force." This is a tool that assists officers in making good, sound decisions and use force reasonably, proportionally, and appropriately to overcome the level of resistance offered. This makes it clear to the officers that the subject dictates the level of resistance, and the officer responds with a level of control. The higher the level of resistance, the higher the

level of control that is needed to subdue the subject and end the conflict as soon as possible.

27. From the time of Defendant KCKPD's initial arrival at the driver's side window of Amarree'ya Henderson's car, until Mr. Henderson was killed, Defendant Schuler and other KCKPD officers who appeared on scene did not use officer de-escalation training in their interactions with Mr. Henderson, and failed to guide, aide, or assist with de-escalation.

28. Defendant Schuler remained positioned in an aggressive stance during his entire interaction with Mr. Henderson and Ms. Hill, with his hand on his weapon, even though Mr. Henderson presented no threat.

29. At no point did any KCKPD officer attempt to de-escalate the interaction between Defendant Schuler and Amarree'ya Henderson.

There was absolutely no reasonable basis for Defendant Schuler to unholster or discharge his firearm at any point during the traffic stop. Prior to his death, Amarree'ya Henderson did not pose any threat to Defendant Schuler or the other KCKPD officers. He was trying to get away from an aggressive officer. He had committed no crime. An objectively reasonable officer would not have escalated the traffic stop, placed himself in harm's way by jumping onto a moving vehicle, or shot blindly into the same under these circumstances. The other officers had not un-holstered their weapons during the traffic stop and seemed to be stunned by what they witnessed.

30. Defendant Schuler's act of jumping onto the doorframe of a moving vehicle was contrary to KCKPD policies and law enforcement standards regarding self-imposed jeopardy.

31. Defendant Schuler's actions of jumping onto the doorframe of the moving vehicle and unholstering his gun were also contrary to de-escalation techniques taught in the annual de-escalation trainings that he received.

32. It was unreasonable for Defendant Schuler to have his weapon unholstered and pointed toward Mr. Henderson, Ms. Hill, or the vehicle in which they were located. It was also unreasonable for Defendant Schuler to step closer to the vehicle when it was clearly pulling away from him. Moving away from the moving vehicle would have been the reasonable and prudent undertaking by Defendant Schuler, considering that it could have been accomplished by taking a step or two back from Mr. Henderson's vehicle. Defendant Schuler was in no danger other than what he created.

33. Defendant Schuler was never in the direct path of the vehicle or in danger of being struck by the vehicle at any time prior to him jumping onto the doorframe of Mr. Henderson's vehicle. Additionally, despite other viable, safe options and not being in a confined area, Defendant Schuler intentionally and unnecessarily continued to place himself in danger.

34. Defendant Schuler violated department policies and police safety standards by recklessly firing his weapon into a moving vehicle which he knew, or should have known, created a great risk that the vehicle would become out of control and cause further unknown harm to the vehicle's occupants, himself, or the general public. Defendant Schuler knew, or

should have known, that firing into a moving vehicle and/or shooting the unarmed driver of a moving vehicle created a potential hazard.

35.     The U.S. Department of Justice, the International Association of Chiefs of Police, and the Police Executive Research Forum have long supported policies against shooting at moving vehicles unless there is a threat other than that posed by the vehicle itself. The KCKPD's policy on shooting at moving vehicles states officers will not shoot at a moving vehicle "except in self-defense or defense of another and when the suspect is using deadly force." Amarree'ya Henderson never used or threatened to use deadly force at any point. At no point was it reported that Henderson was armed while in his vehicle. He never possessed a firearm of any kind.

36.     Further, KCKPD's policy regarding Discharging Firearms states "Because firing at or from a moving vehicle adversely affects accuracy…if the driver of the subject vehicle is disabled, the vehicle may be left without an able driver, firing at a suspect vehicle is prohibited except when in the direction of the officer it is used <u>as a last resort</u> when reasonably necessary to prevent serious injury to or death of the officer or innocent persons." No officers or civilians were ever in any danger. There were numerous viable and safe options available to Defendant Schuler other than killing Mr. Henderson.

37.     A vehicle departing a traffic stop does not give a police officer an ongoing license to kill an unthreatening citizen. At no point prior to the two (2) shots fired by Defendant Schuler had Henderson threatened to harm the officers. It was never alleged or reported that Henderson was armed with any type of weapon while he was inside the vehicle. Mr. Henderson never waved or otherwise displayed any weapon to officers. Mr. Henderson never attempted to exit the vehicle. Mr. Henderson was not wanted for any crimes,

committed no crime, and there was no reasonable belief that Henderson posed a threat of serious physical harm to the officers or to others.

38.     Mr. Henderson's actions never posed a threat to Defendant Schuler or the safety of any police officers.  Defendant Schuler was not in danger at any point during the moments he took Henderson's life.

39.     Defendant Schuler violated known department policies and gun safety standards by recklessly firing his weapon in a densely populated neighborhood when others, including KCKPD officers, were in unsafe positions beyond his target or "down range."

40.     Defendant Schuler exercised his power as an officer unreasonably and irresponsibly and knowingly violated the law.

41.     Defendant Schuler did not reasonably believe it was necessary to use deadly force.  He acted recklessly and deliberately when he shot and killed Amaree'ya Henderson. Henderson's conduct of simply driving his vehicle forward did not justify or necessitate Defendant Schuler shooting at him or taking his life.

## COUNT I

**42 U.S.C. § 1983 - Use of Excessive Force Violation of Fourth & Fourteenth Amendment (Plaintiff vs. Defendant Schuler)**

42.     Plaintiff incorporates by reference all previous paragraphs as though fully set forth herein.

43.     The Fourth Amendment provides that citizens of the United States are to be free from unreasonable search and seizures of their person, and prohibits the use of excessive force against citizens, including Plaintiff.

44. Defendants knew or should have known that the Fourth Amendment prohibits the use of excessive force against citizens, including Plaintiff.

45. Defendant Schuler used excessive force in violation of the constitutional rights of Plaintiff when he shot and killed him.

46. Defendants acted under the color of state law at relevant times herein. Defendant Schuler acting under the color of state law, caused Amarree'ya Henderson's constitutional rights to be deprived.

47. The degree of force used by Defendant Schuler was excessive because the amount of force used, which resulted in Amarree'ya Henderson's death, was not reasonable or necessary under the circumstances and was not that of a reasonable officer under the circumstances. But for Defendant Schuler's use of excessive force, Amarree'ya Henderson would be alive.

48. Defendant Schuler knew or should have known the amount of force used and the manner in which he shot at and killed Amarree'ya Henderson was not that of a reasonable officer under the circumstances.

49. Defendant Schuler knew or should have known the excessive force exerted by him and set forth with more particularity above violated the constitutional rights of Amarree'ya Henderson to be free from unreasonable seizure and excessive force.

50. Defendant Schuler used excessive and deadly force in violation of the constitutional rights of Amarree'ya Henderson when he shot Decedent Amarree'ya Henderson at a traffic stop. An actionable seizure occurred pursuant to the Fourth Amendment when Amarree'ya Henderson was shot and eventually lost his life as a result.

51. This seizure was unreasonable considering the facts and circumstances

alleged herein.

52. The degree of force used by Defendant Schuler was excessive because it was not reasonably necessary to interact with Amarree'ya Henderson during the traffic stop.

53. Defendant Schuler unnecessarily escalated the situation when he unholstered his weapon, took aim at Amarree'ya Henderson, and placed himself in danger.

54. Defendant Schuler did not move further away from the Henderson's vehicle when it was the most reasonable and safest option under the circumstances.

55. Defendant Schuler failed to de-escalate the situation as required by his training and KCKPD policies and procedures.

56. Defendant Schuler failed to properly notify Amarree'ya Henderson or otherwise explain the reasons for the traffic stop.

57. Defendant Schuler failed to properly attempt to communicate with Amarree'ya Henderson despite having more than adequate time to do so before killing him.

58. Defendant Schuler failed to take other more reasonable, readily available, and non-life threating methods during the traffic stop.

59. Defendant Schuler was a safe distance from the vehicle, and then decided to put himself in danger before firing the shots that killed Amarree'ya Henderson.

60. No reasonable officer in the position of Defendant Schuler would made the series of decisions before and after the traffic stop and used deadly force in shooting a fearful Amarree'ya Henderson. No reasonable officer further would put himself in danger by mounting a vehicle under the circumstances and shooting into a moving vehicle.

61. Any reasonable officer would have known that shooting Amarree'ya Henderson and killing him under these circumstances was an unlawful and unreasonable

use of excessive force.

62. Defendant Schuler's own reckless and deliberate conduct described herein unreasonably created the situation in which he unreasonably shot and killed Amarree'ya Henderson.

63. At the time Defendant Schuler shot at Amarree'ya Henderson, Defendant Schuler was not in an area of danger where he could be injured because shots were fired at Amarree'ya Henderson as his vehicle was moving slowly.

64. Had Defendant Schuler not intentionally escalated the traffic stop and placed himself in danger the events leading up to the shooting and death of Amarree'ya Henderson would not have occurred. Had Defendant Schuler attempted to properly communicate with Amarree'ya Henderson, then the events described herein would not have occurred.

65. Defendant Schuler's use of deadly force was unreasonable and reckless.

66. The acts of Defendant Schuler were wanton, malicious, evil, oppressive, or involved reckless indifference to the federally protected rights of Amarree'ya Henderson thus entitling Plaintiff to an award of punitive or exemplary damages against Defendant Schuler.

a) The conduct of Defendant has caused Plaintiff damages including, but not limited to:

   a. Pain, suffering, fear, anxiety, emotional distress prior to Decedents' death,

   b. Physical pain and suffering from the gunshot wounds prior to his death,

   c. The knowledge of impending death,

   d. The loss of income, filial care, attention, services, guidance, advice, care, and companionship,

   e. Economic damages associated with his death, including funeral expenses

and medical care provided, and

    f.    The loss of his life.

67.    Plaintiff is entitled to recover from Defendant reasonable attorney's fees and expenses provided by 42 U.S.C. § 1988.

WHEREFORE, Plaintiff requests that the Court, after a trial by jury of the claims, enter judgment against Defendant, for their actual damages, compensatory damages, or nominal damages, for punitive or exemplary damages, for attorney fees and expenses pursuant to 42 U.S.C. § 1988, the costs, and for any relief the Court deems necessary and just.

## COUNT II

### (Negligence and Wrongful Death - Plaintiff vs. Defendant Schuler)

68.    Plaintiff incorporates by reference all previous paragraphs as though fully set forth herein.

69.    Defendant Schuler breached a duty of care as an officer of the law and exposed Decedent to an unreasonable risk of harm by:

    a.    Failing to adhere to established procedures, policies, and protocols;

    b.    Using an excessive and unreasonable amount of force;

70.    The degree of force used by Defendant Schuler was excessive because it was not reasonably necessary to interact with Amarree'ya Henderson during the traffic stop.

71.    Defendant Schuler unnecessarily escalated the situation when he jumped onto a moving vehicle, un-holstered his weapon, and fired shots into a moving vehicle.

72.    Defendant Schuler did not move away from Henderson's vehicle when it was the most reasonable and safest option under the circumstances.

73. Defendant Schuler failed to de-escalate the situation as required by his training and KCKPD policies and procedures.

74. Defendant Schuler failed to properly notify Amarree'ya Henderson or otherwise explain the reasons for the traffic stop.

75. Defendant Schuler failed to properly attempt to communicate with Amarree'ya Henderson despite having more than adequate time to do so before killing him.

76. Defendant Schuler failed to take other more reasonable, readily available, and non-life threatening methods during the traffic stop.

77. This negligence caused the untimely death of the Amarree'ya Henderson.

## COUNT III

### 42 U.S.C. § 1983 - Violative Policies, Procedures, Practices and Customs
### (Plaintiff vs. Defendants KCKPD and UG)

78. Plaintiff incorporates by reference all previous paragraphs as though fully set forth herein.

79. There existed within the Defendant Kansas City Kansas Police Department and Defendant UG policies, procedures, customs, practices, or usages that are so pervasive, that they constitute the policies that apply to Kansas City Kansas Police department and are the moving force behind the constitutional deprivations of Amarree'ya Henderson and caused damages as previously stated.

80. The policies, practices, procedures, customs, and usages that exist are:

   a. That officers of the Kansas City Kansas Police Department use excessive force, including deadly force, without regard for the need for the use of force, or without regard for the legality of its use;

b. That officers of the Kansas City Kansas Police Department can use excessive force when it is not necessary and warranted where the KCKPD failed to take action or adequately punish officers that violate the constitutional rights of its citizens as more fully described above;

c. That officers of the Kansas City Kansas Police Department engage in conduct that is violative of the constitutional rights of citizens of the United States, with whom they come in contact, including but not limited to: unjustifiably detaining and/or shooting people in violation of the Constitution of the United States;

d. That Defendant Kansas City Kansas Police Department willfully and deliberately fails to supervise and train its officers when lethal force can and should be used, and allows its officers to use deadly force when it is not warranted or called for in violation of citizens' constitutional rights;

e. That officers of the Kansas City Kansas Police Department are allowed to fire into moving vehicles when it constitutes an unreasonable danger and is not consistent with present-day police policies and procedures;

f. That officers of the Kansas City Kansas Police Department are not fully or properly trained on how to respond to a crisis intervention call for service and are allowed to respond to said calls without direction and in an inconsistent manner;

g. That officers of the Kansas City Kansas Police Department are not properly trained or instructed on how to safely approach a slow-moving vehicle and are allowed to approach in the manner described with more specificity

    herein; and

    h. That officers of the Kansas City Kansas Police Department are allowed to undertake the activities described with more specificity herein.

  81. Defendants UG and KCKPD are and were vested with the authority to train, supervise, discipline, and otherwise control the officers of the Kansas City Kansas Police Department. Defendants UG and KCKPD failed to change its orders, policies, procedures, practices, customs, and usages by failing to properly hire, train, supervise, discipline, and control the officers of the KCKPD including failing to act in the face of transgressions, deficiencies, and unconstitutional conduct of its officers of which they knew or should have known.

  82. As the lawfully designated policy-making body, Defendants UG and KCKPD have the power and responsibility to prevent the existence of the conduct, policies, procedures, practices, and customs that violate the constitutional rights of citizens of the United States, and have failed to and refused to do so, and, therefore— has been and continues to be deliberately indifferent to the rights of the citizens of the United States, with whom the police officers of Kansas City, Kansas come in contact.  The failure of Defendant Kansas City Kansas Police Department to act in the face of constitutionally violative conduct caused the constitutional deprivations that have been suffered by Decedent Amarree'ya Henderson.

  83. There exists within the UG and KCKPD employee hiring, training, supervision and retention policies, procedures and practices that are so pervasive they constitute the policies that apply to KCKPD, which were a moving force behind and thereby caused the constitutional deprivations suffered by Plaintiff.  There has been a failure to adopt

employee hiring, training, supervision and retention policies, procedures and practices that would have prevented the constitutional deprivations suffered by Plaintiff alleged herein.

84. Defendants UG and KCKPD's failure to adequately train Defendant Schuler amounted to a deliberate or conscious indifference to the rights of the Amarree'ya Henderson.

85. Defendants UG and KCKPD enacted, condoned, ratified, and/or allowed the policies, procedures, practices, customs, and usages set above which caused or contributed to cause the unconstitutional violations and death of Amarree'ya Henderson and damages sustained by Amarree'ya Henderson.

86. In their failures, policies, procedures, practices, customs, and usages, as previously described, Defendants UG and KCKPD intentionally disregarded known facts or alternatively, were deliberately indifferent to a risk of constitutional violations of which they knew or should have known, and their culpability caused the constitutional violations to Decedent Amarree'ya Henderson in causing his death and the damages to Amarree'ya Henderson.

87. The acts of Defendants UG and KCKPD were wanton, malicious, evil, oppressive, or involved reckless indifference to the federally protected rights of Decedent, Amarree'ya Henderson, thus entitling Plaintiff to an award of punitive or exemplary damages against Defendant Schuler.

88. The policies, procedures, practices, customs, and usages and conduct of Defendants caused the Plaintiff's damages including but not limited to:

    a. Pain, suffering, fear, anxiety, emotional distress prior to Decedents' death,

    b. Physical pain and suffering from the gunshot wounds prior to his death,

      c.  The knowledge of impending death,

      d.  The loss of income, filial care, attention, services, guidance, advice, care, and companionship,

      e.  Economic damages associated with his death including funeral expenses and medical care provided, and

      f.  The loss of his life.

89. Plaintiff is entitled to recover from Defendants reasonable attorney fees and expenses provided by 42 U.S.C. § 1988.

WHEREFORE, Plaintiff requests that the Court, after a trial by jury of the claims, enter judgment against Defendant, for actual damages or nominal damages, for attorney's fees and expenses pursuant to 42 U.S.C.§ 1988, costs, for exemplary or punitive damages in excess of $30 Million dollars and for any other relief the Court deems necessary and just.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all counts.

Respectfully submitted,

/s/ Milesha Segun
Milesha Segun
Kansas Bar No. 28290
Nuru Witherspoon
Kay Harper Williams
Pro Hac Vice Applicants
**THE WITHERSPOON LAW GROUP, PLLC**
5565 Deer Creek, Unit A
Dallas, Texas 75228
(214) 773-1133 PH
(972) 696-9982 FX
litigation@twlglawyers.com
witherspoon@twlglawyers.com

williams@twlglawyers.com
**ATTORNEYS FOR PLAINTIFF**