UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

PAULETTA JOHNSON, individually and as heir )
at law of AMAREE'YA HENDERSON, deceased, )
and SHAKIRA HILL, )
                         )
                Plaintiffs, )
                         )      Case No. 24-2329-TC-GEB
v. )
                         )
UNIFIED GOVERNMENT OF WYANDOTTE )
COUNTY AND KANSAS CITY, KANSAS, )
KARL A. OAKMAN, and AUSTIN SCHULER, )
                         )
                Defendants. )

## <u>PRETRIAL ORDER</u>

On November 25, 2025, U.S. Magistrate Judge Gwynne E. Birzer conducted a pretrial conference in this case by videoconference. Plaintiffs Pauletta Johnson and Shakira Hill appeared through counsel Suzanne Hale Robinson. Defendant Unified Government of Wyandotte County, et al, appeared through counsel Ryan Denk and Kathryn Dumovich.

This pretrial order supersedes all pleadings and controls the subsequent course of this case. It will not be modified except by consent of the parties and the court's approval, or by order of the court to prevent manifest injustice. Fed. R. Civ. P. 16(d) & (e); D. Kan. Rule 16.2(a).

1.       **PRELIMINARY MATTERS.**

       a.       **Subject-Matter Jurisdiction.**   Subject-matter jurisdiction is invoked under 28 U.S.C. § 1331 and §1367. Subject-matter jurisdiction is contested by Defendants on the

basis that Defendants contend that Plaintiffs lack standing to bring direct claims on behalf of Amaree'Ya Henderson.

      **b.**    **Personal Jurisdiction.**  The court's personal jurisdiction over the parties is not disputed.

      **c.**    **Venue.**  Venue in this court is not disputed.

      **d.**    **Governing Law.**  Subject to the court's determination of the law that applies to the case, the parties believe and agree that the substantive issues in this case are governed by the following law:

> Fourth and Fourteenth Amendments to the United States Constitution; 42 U.S.C. §§ 1983 & 1988; Kansas Tort Claims Act, K.S.A 75-6101 et seq.; Kansas Wrongful Death Act, K.S.A. 60-1901 et seq.; K.S.A. 21-5227(a); K.S.A. 60-258a; K.S.A. 60-19a01; K.S.A. 60-19a02.

**2.**    **STIPULATIONS.**

      **a.**    **The following facts are stipulated:**

    1.    On April 26, 2023, decedent Amaree'ya Henderson was operating a motor vehicle in Kansas City, Kansas, with Plaintiff Shakira Hill in the passenger seat.

    2.    Defendant Officer Austin Schuler was at all relevant times employed by the Kansas City, Kansas Police Department (KCKPD) and acting under color of state law.

    3.    Defendant Unified Government of Wyandotte County/Kansas City, Kansas (UG) was at all relevant times the municipal employer of Defendant Schuler and Defendant Chief Karl A. Oakman.

    4.    Defendant Chief Karl A. Oakman was at all relevant times the Chief of Police for KCKPD.

5.      Officer Schuler initiated a traffic stop of Henderson's vehicle based on an expired Missouri license plate and an inoperable headlight.

6.      Henderson pulled over and came to a stop on the right side of the roadway.

7.      After questioning the purpose of the stop, Henderson provided identifying information including his driver's license, his vehicle insurance, and assisted Schuler visually by uncovering the VIN in response to the officers' inquiries.

8.      Officer Schuler had Henderson's identifying information in his possession for use in running Henderson's information through dispatch.

9.      Henderson informed Officer Schuler that the driver's window "was not operable," and Henderson lowered the rear window instead.

10.      As he approached the lowered window, Officer Schuler testified that he smelled an odor of burnt marijuana from the vehicle.

11.      Officer Schuler testified he did not personally believe the smell of burnt weed itself was a serious offense.

12.      Officer Grado testified he did not recall smelling the odor of burnt marijuana during the traffic stop.

13.      The possession and use of marijuana for any purpose is illegal in the state of Kansas, where the stop occurred.

14.      Officer Schuler called for backup.

15.      Officer Schuler did not report to dispatch the reason for his request for back up and did not report that he would be asking Henderson to exit the vehicle.

16.    Officer Schuler later testified that he called for backup to assist him in removing the vehicle occupants and searching the vehicle.

17.    Additional KCKPD officers, including Officers Ricardo Grado and Caleb Munson, arrived to assist during the stop.

18.    The interaction between Henderson, Hill, and the officers was recorded by body-worn camera and dash-camera systems, capturing the stop, the subsequent movement of the vehicle, and the shooting.

19.    Officer Schuler asked for Henderson and Hill to exit the vehicle so the officers could search based on the smell of burnt marijuana.

20.    Henderson did not exit the vehicle after being asked to.

21.    Approximately 45 seconds after the driver's door was opened, Henderson placed the vehicle in drive.

22.    Officer Schuler testified that he opened the driver's door knowing he was going to ask Henderson to exit the vehicle.

23.    The moment Schuler decided to enter Henderson's vehicle, the vehicle was stationary.

24.    Schuler testified he knew Henderson was attempting to drive off before he stepped into Henderson's vehicle.

25.    As the vehicle was being put into drive, Schuler placed his right hand on the exterior driver's side of the vehicle.

26.    As the vehicle began to move forward, Schuler placed his second hand on the vehicle and placed his feet inside the vehicle.

4

27.    The vehicle continued down the street.

28.    As the vehicle was moving, Officer Schuler instructed Henderson to stop the car.

29.    Ms. Hill yelled "stop" multiple times as the car traveled down the road.

30.    As the vehicle was moving, Officer Schuler warned that he would shoot Henderson.

31.    Almost simultaneously, the vehicle impacted a parked vehicle, and Officer Schuler fired two consecutive shots striking Henderson.

32.    Henderson sustained gunshot wounds and died from those wounds, as determined by the Wyandotte County Medical Examiner in a written autopsy report.

33.    No firearm was recovered from Henderson or from inside the vehicle.

34.    Plaintiff Hill remained seated in the passenger seat throughout the encounter.

35.    Plaintiff Hill and Plaintiff Johnson have both sought and received medical treatment consistent with the medical records produced in this case as a result of Mr. Henderson's death.

**b.    The parties have stipulated to the admissibility of the following exhibits for purposes of summary judgment and trial:**

1.    Wyandotte County Medical Examiner Autopsy Report of Amaree'ya Henderson, including photographs.

2.    KCKPD body-worn camera footage from Officer Schuler and all responding officers.

3.    KCKPD dash-camera video from vehicles responding to the incident.

4.    Crime Scene Unit photographs, diagrams, and forensic documentation.

5.    911 call audio recordings related to the incident.

6.    KCKPD Use-of-Force policies, pursuit policies, BWC policies, and any other departmental policy documents produced in discovery.

7.    Plaintiffs' medical records and  employment records as previously disclosed.

8.    The KCKPD training records for Officer Schuler.

9.    The KCKPD disciplinary records of Officer Schuler.

10.    All documents produced by the Wyandotte County Crime Lab that have been previously produced by the parties.

**3.    FACTUAL CONTENTIONS.**

    **a.    Plaintiffs' Factual Contentions.**

***I. § 1983 Excessive Force Claim Against Defendant Schuler***

Plaintiffs contend that on April 26, 2023, Defendant Officer Austin Schuler stopped Decedent Amaree'ya Henderson for the minor traffic infractions of an expired tag and an inoperable headlight, which Schuler admitted under oath were *not serious offenses* and did not justify arrest. Plaintiffs contend Henderson immediately pulled over, complied with Schuler's requests, provided identifying information and insurance, uncovered the VIN, and attempted to lower a window that Schuler later confirmed was simply inoperable. Plaintiffs assert that Schuler testified Henderson was "cool," "complying with all of my requests," and that nothing Henderson did made Schuler fearful.

Plaintiffs contend that while Henderson and Plaintiff Shakira Hill were attempting to comply, additional officers arrived, and Schuler, without probable cause to arrest, decided he would search the vehicle. Plaintiffs assert that when Henderson started the vehicle, the body-worn camera video shows the vehicle moving slowly with space for Schuler to step away. Instead, Plaintiffs contend Schuler advanced toward the vehicle, made voluntary physical contact with the exterior driver's side, jumped inside the vehicle, and remained positioned there as the car traveled a short distance down the street.

Plaintiffs contend the video shows the vehicle steering toward the right side of the roadway before contacting a parked car. Plaintiffs further assert that while still on the exterior of the vehicle, Schuler fired two rounds from his service weapon, one striking Henderson's arm and one striking the left side of his head or face, causing his death. Plaintiffs contend Henderson was unarmed, no weapon was recovered, and the speed and movement of the vehicle, as well as Schuler's lack of injury, demonstrate Henderson did not pose an immediate threat of death or serious bodily harm when deadly force was used.

## II. *§ 1983 Monell and Failure-To-Train Claims Against UG*

Plaintiffs contend the UG maintained policies, customs, or practices that were moving forces behind the constitutional violation. Plaintiffs assert that KCKPD policies prohibit voluntarily placing oneself in the path of a moving vehicle and prohibit firing at or from a moving vehicle except under narrowly defined conditions, and that Schuler's actions violated these policies. Plaintiffs further contend that KCKPD has a pattern of inadequate training and supervision related to vehicular encounters, de-escalation, and use

of force, including training failures that allow officers to mount moving vehicles, a practice multiple officers admitted is unsafe and not taught.

Plaintiffs assert that post-incident investigative materials reflect inconsistencies and omissions that minimized or disregarded body-worn camera evidence contradicting Schuler's account. Plaintiffs contend that the decision to clear Schuler, despite these inconsistencies, reflects a longstanding custom of tolerating unconstitutional uses of force. Plaintiffs also contend that the UG's failure to discipline Schuler or address officer testimony that such conduct was unsafe amounts to ratification of the conduct at issue.

### III. § 1983 Supervisory Liability Claim Against Defendant Oakman

Plaintiffs contend that Chief Karl Oakman, as KCKPD's final policymaker, was responsible for supervising, training, and evaluating KCKPD officers in use-of-force practices. Plaintiffs assert that Oakman ratified Schuler's conduct by determining internally that the shooting was justified, despite video evidence showing contradictions between Schuler's statements and the recordings. Plaintiffs contend Oakman failed to correct or discipline Schuler, failed to require additional training, and failed to address the recurring risk posed by officers mounting moving vehicles. Plaintiffs assert these failures contributed to the environment that allowed the constitutional violation to occur.

### IV. Wrongful Death and Negligence Claims Against Schuler and UG

Plaintiffs contend Schuler owed Henderson a duty to exercise ordinary care in conducting the traffic stop and in employing force. Plaintiffs assert that Schuler breached this duty by escalating a non-threatening encounter, placing himself in contact with a moving vehicle, firing his weapon while mounted on the vehicle, and using deadly force

when Henderson posed no imminent threat. Plaintiffs contend these breaches directly caused Henderson's injuries and death.

Plaintiffs contend the UG is liable under the Kansas Tort Claims Act because Schuler was acting within the scope of his employment and KCKPD policies governing safe vehicle interactions were mandatory, non-discretionary, and intended to protect the public from foreseeable harm resulting from officer-created danger.

### V. Plaintiff Hill's Individual Claims (Emotional Distress)

Plaintiffs contend that Hill, seated inches from Henderson, witnessed the two gunshots, Henderson's immediate injuries, and his collapse following the shooting. Plaintiffs assert Hill also experienced the crash into the parked vehicle, observed Henderson's bleeding and non-responsiveness, and believed she was in danger during the shooting. Plaintiffs contend Hill suffered severe emotional distress as a direct result.

### VI. Plaintiff Johnson's Wrongful Death Damages

Plaintiffs contend that Plaintiff Pauletta Johnson, Henderson's mother and heir at law, was on a live FaceTime call during the encounter and witnessed significant portions of the events leading up to the shooting and its aftermath. Plaintiffs assert Henderson provided financial, emotional, and familial support to Johnson, and that Johnson has suffered pecuniary and non-pecuniary losses resulting from his death.

#### b. Defendants' Factual Contentions.

### I. § 1983 Excessive Force Claim Against Defendant Schuler

On the evening of April 26, 2023, Defendant Officer Austin Schuler stopped Decedent Amaree'ya Henderson due to a temporary tag that had expired two years prior to

the stop and due to an inoperable headlight. Henderson had been pulled over for this exact expired temporary tag by Kansas City Missouri Police about seven months before this incident. Henderson was the driver and his girlfriend Shakira Hill was in the passenger seat.

Officer Schuler approached the vehicle at which time Henderson informed Officer Schuler that the driver's window did not work. Henderson rolled down the driver's side rear window to speak with Schuyler. Upon approaching the vehicle, Officer Schuler noticed a strong odor of burnt marijuana coming from the vehicle. The possession or consumption of marijuana is illegal in the state of Kansas. Schuler knew at that point that he was going to order Henderson and Hill out of the vehicle to conduct a vehicle search for marijuana and that he needed backup to do so. Accordingly, while waiting for Henderson to provide his driver's license and proof of insurance, Schuler called in to dispatch requesting backup.

After Henderson provided his license and proof of insurance, Schuler informed the individuals that he would run some information and come back. Schuler ran Henderson's information and found no warrants and that he had a valid license. Schuler began to write a ticket to Henderson for the expired tags but did not complete the citation as he knew further enforcement action by way of the vehicle search was planned. Schuler waited in his vehicle for approximately 10 minutes for backup to arrive.

Once backup arrived, body-worn camera footage shows Schuler say to himself "the devil's lettuce" indicating that he smelled marijuana. Schuler approached the driver again while another officer, Officer Grado, approached Ms. Hill on the passenger side of the

vehicle. Schuler opened Henderson's driver's side door and repeatedly asked Henderson to step out of the vehicle because he smelled burnt marijuana, and Schuler advised that the officers were going to search the car. Officer Grado on the passenger side also advised that the occupants need to get out of the car to search for marijuana and attempts to de-escalate the situation stating, "No one is going in handcuffs." Henderson became somewhat argumentative as Schuler opened the driver's door and explained that he needs them to exit the vehicle. Hill can be heard telling Henderson to do what they are asking.

Henderson refused to exit the vehicle, and Hill can be seen on body worn camera reaching for the door handle to exit the vehicle as requested. As Schuler continued to request that the individuals exit the vehicle, Henderson began reaching near the ignition.

As Henderson began reaching toward the ignition, Schuler moved towards the open door. Schuler testified that this was an attempt to remove Henderson from the vehicle and to prevent him from driving away. Schuler told Henderson "don't do that" as Henderson grabbed his keys to turn the ignition and start the car. At that time, Henderson began driving the vehicle forward and to the left. With his momentum moving forward and forced to make a split-second decision and afraid he would have been hit by the forward-moving vehicle, Officer Schuler hangs onto the top of the car's doorframe and steps into the vehicle as it moves down the road.

Henderson then accelerated, driving erratically onto the left side of the road toward a tree line with Officer Schuler hanging onto the door frame. As the car moves forward,

Schuler yelled for Henderson to stop the car. Hill can be heard also screaming for Henderson to stop the car repeatedly.

During this extremely quick segment, Schuler reached for his service weapon and continued to yell for Henderson to stop. When the car did not stop, Schuler gave a warning to stop or he will shoot. Officer Schuler testified that he was in fear for his life at this moment, as the car was accelerating and headed toward trees with Officer Schuler's body hanging onto the vehicle.

Schuler then fired his weapon twice, hitting Henderson in the neck and torso. Contemporaneous with the discharge of the firearm, the vehicle crashed into another vehicle parked on the road. Officer Schuler is ejected from the side of the vehicle. Schuler, once upright again, took the keys out of the ignition. Schuler experienced some injuries including cuts, scrapes and bruising. Hill remained in the passenger seat and did not experience serious physical injuries. Henderson died as a result of the gunshot wounds.

In making the decision to flee from a lawful order to exit his vehicle, starting his car, and accelerating down the road with Schuler in his open car doorway, Henderson placed Schuler, himself and Hill at risk for great bodily harm or death. He additionally placed Hill and Pauletta Johnson at risk for emotional distress.

The Kansas City Missouri Polce Department was called to perform the Officer Involved Critical Incident (OICI) investigation, as dictated by an agreement between the agencies. The agreement was put in place so that an outside agency exercising independence and objectivity could conduct the investigation. KCMO conducted the criminal investigation as is done with all officer involved shootings to determine if the

homicide was justified or not. In searching the vehicle, KCMO found a baggie of marijuana in the center console of Henderson's vehicle. There was also an ash cup in Henderson's vehicle with ashes and burnt roaches. Autopsy and toxicology reports showed that Henderson had significant amounts of marijuana metabolites in his system at the time of the incident.

KCMO presented their investigation to the Wyandotte County District Attorney, Mark DuPree, for consideration of criminal prosecution. The Wyandotte County DA declined to press charges. The FBI also reviewed the file and declined to pursue further criminal investigation.

As seen on body worn cameras, multiple witnesses to the incident reported that it looked like Officer Schuler was "being dragged" by Henderson once he took off from the scene.

**II**. *§ 1983 Monell and Failure-To-Train Claims Against UG*

The Unified Government of Wyandotte County/Kansas City, Kansas maintained no policies, customs, or practices that were moving forces behind Plaintiffs' alleged constitutional violations. Plaintiffs argue that Officer Schuler violated the KCKPD General Order 40.04 Pursuit Policy by firing his weapon while in fear for his life inside Henderson's vehicle. General Order 40.04(H)(5) prohibits officers from discharging their weapon at a moving vehicle in a scenario where the officer is not confronted with an "direct, immediate, deadly force confrontation." In this incident, Officer Schuler did not fire his weapon blindly at a moving vehicle, as this policy prohibits. Officer Schuler while within the moving vehicle and in direct and immediate fear for his life, fired

two shots at Henderson's person to prevent him from continuing to push the gas pedal. Even if Schuler did violate the policy in question, that is not evidence of a *Monell* claim against the Unified Government.

Plaintiffs fail to show that the KCKPD has a pattern of inadequate training and supervision related to vehicular encounters, de-escalation, and use of force. The KCKPD does not train its officers to enter a vehicle as it is moving, as Plaintiffs allege. Officer Schuler opened the driver's door to attempt to extract him before the car began moving. The KCKPD does adequately train its officers on extracting a driver from a vehicle (General Order 60.03 Traffic Enforcement) and does adequately train its officers on when it is appropriate to use deadly force (General Order 1.02 Use of Force). Plaintiffs have not identified any policy, custom, or practice from a final policy maker of the Unified Government which Plaintiffs claim to be the moving force behind their claimed Constitutional violations.

### III. § 1983 Supervisory Liability Claim Against Defendant Oakman

Chief Karl Oakman is one of the KCKPD's final policymakers and is involved in supervising, training, and evaluating KCKPD officers in use-of-force practices. Plaintiffs do not identify any failure of Chief Oakman that resulted in the Constitutional injuries claimed by Plaintiff. Chief Oakman's review of the facts of this incident and his conclusions as to the propriety of discipline does not constitute conduct that resulted in Plaintiff's claimed Constitutional injuries giving rise to Plaintiff's claims. Chief Oakman testified that the KCKPD does not train officers to enter moving vehicles, and he did not believe Officer Schuler did so in this incident.

14

*IV. Wrongful Death and Negligence Claims Against Schuler and UG*

As seen in the multiple forms of body worn camera footage and dash cam footage provided by the KCKPD, Officer Schuler initiated an appropriate and simple encounter with Henderson when he initially pulled Henderson over. When Henderson was informed that he and Hill would have to exit the vehicle, Henderson escalated the incident due to Henderson's refusal to exit the vehicle. Officer Schuler clearly informed Henderson that the search would be conducted due to marijuana odor emanating from the vehicle.

Due to Henderson's refusal to exit the vehicle for the search, Officer Schuler opened the driver's door and attempted to extract Henderson after giving proper warning. While within the door frame of the open driver's door, Henderson again escalated the situation by starting the vehicle and pressing the gas to drive off.

Officer Schuler made a reasonable split-second decision, as is common in the field of policing, and he held onto the car and braced himself in an attempt to not be run over. Officer Schuler testified that he felt he did not have time to back away from the vehicle as it moved because he was already within the door frame.

While hanging onto the vehicle, Officer Schuler yelled continuously for Henderson to stop the vehicle. Again, Henderson refused to comply with instruction and continued to drive down the street, veering toward the tree line. Officer Schuler, on the left side of the vehicle, which was headed to the tree line, reasonably believed that he was going to hit the trees and die or suffer serious bodily injury. Because of this direct and imminent fear of death, Officer Schuler warned Henderson that he would shoot, and he fired two shots at Henderson. Officer Schuler likely would not have fired his weapon if Henderson had

15

stopped the vehicle as the officer requested. Instead, Henderson chose to place Officer Schuler's life in danger, Shakira Hill and his own life in danger.

### V. Plaintiff Hill's Individual Claims (Emotional Distress)

Hill experienced personal distress as her boyfriend chose to attempt to flee from a Constitutional traffic stop. Hill, as a passenger in Henderson's vehicle, witnessed Henderson's death. However, Hill's distress was directly caused by Henderson's decision to place Hill's life in danger, Officer Schuler's life in danger, and his own life in danger. Officer Schuler's decision to fire his weapon was directly in response to Henderson's own actions.

### VI. Plaintiff Johnson's Wrongful Death Damages

Johnson experienced personal distress as her son chose to attempt to flee from a Constitutional traffic stop. Johnson witnessed Henderson's death while on FaceTime with Hill. However, Johnson's distress was directly caused by Henderson's decision to place Hill's life in danger, Officer Schuler's life in danger, and his own life in danger. Officer Schuler's decision to fire his weapon was directly in response to Henderson's own actions.

**4.    LEGAL CLAIMS AND DEFENSES.**

   **a.    Plaintiffs' Claims.**

Plaintiffs assert that they are entitled to recover upon the following theories:

**42 U.S.C. § 1983: Excessive Force/Unreasonable Seizure and State-Created Danger (Against Defendant Schuler in His Individual Capacity).** Plaintiff Pauletta

Johnson, individually and as heir at law of Decedent Amaree'ya Henderson, asserts a federal civil-rights claim under 42 U.S.C. § 1983 against Defendant Officer Austin Schuler, in his individual capacity, for violating Decedent's clearly established rights under the Fourth and Fourteenth Amendments. Johnson contends that Schuler used objectively unreasonable and excessive deadly force during a routine traffic stop by leaping onto Decedent's moving vehicle and shooting him twice, once in the arm and once in the face, when Decedent posed no immediate threat of serious physical harm to Schuler or others, and when less intrusive and safer alternatives were readily available (including allowing the vehicle to move forward and apprehending Decedent later, given that officers already had his identification and address and three police units were present).  Johnson further contends that Schuler affirmatively created or enhanced a particularized danger to Decedent by choosing to jump onto the moving vehicle and then firing into it, thereby placing Decedent in a more dangerous situation than he otherwise faced, in conscious disregard of a known and obvious risk. These acts and omissions are alleged to be the direct and proximate cause of Decedent's death and Johnson's damages, and are asserted as the § 1983 claim "Use of Excessive Force Against Defendant Schuler in Violation of the Fourth Amendment and Liability for a State-Created Danger Under the Fourteenth Amendment" in Plaintiffs' First Amended Complaint (ECF No. 65).

**42 U.S.C. § 1983: Municipal and Official-Capacity Liability (Against the Unified Government and Defendant Oakman in His Official Capacity).** Plaintiff Johnson, as heir at law of Decedent, and Plaintiff Hill assert § 1983 claims against the Unified Government of Wyandotte County/Kansas City, Kansas and against Chief Karl

Oakman in his official capacity, based on policies, practices, customs, and failures in training, supervision, discipline, and ratification that allegedly were the moving force behind the violation of Decedent's constitutional rights. Plaintiffs contend that, long before the incident at issue, the Kansas City, Kansas Police Department ("KCKPD"), for which the Unified Government and Oakman were policymakers, developed and maintained a pattern of excessive force and police brutality, particularly toward African Americans, by: (a) failing to adequately train and supervise officers regarding traffic stops, use of force, and lethal force; (b) tolerating and not disciplining the excessive use of force; (c) failing to enforce written policies and allowing officers to ignore them; and (d) failing to implement or enforce adequate policies restricting the use of deadly force from or at moving vehicles, protecting innocent bystanders, and requiring de-escalation where feasible. Plaintiffs allege that these longstanding customs and practices, as well as Oakman's ratification of Schuler's conduct after the shooting, were closely related to and the moving force behind Schuler's unconstitutional use of force against Decedent and the resulting wrongful death. These theories are asserted in the § 1983 Monell/official-capacity claims against the Unified Government and Oakman in Plaintiffs' First Amended Complaint.

**42 U.S.C. § 1983: Use of Excessive Force/Supervisory Liability (Against Defendant Oakman in His Individual Capacity).** Plaintiff Johnson, as heir at law of Decedent, and Plaintiff Hill assert an individual-capacity supervisory-liability claim under 42 U.S.C. § 1983 against Oakman. Plaintiffs contend that Oakman, as KCKPD Chief of Police and Schuler's supervisor, personally participated in, directed, encouraged, and/or acquiesced in the constitutional violations alleged, and that his deliberate indifference and

18

reckless disregard for known and obvious risks to citizens like Decedent and Hill caused or contributed to the violations of Decedent's rights. Plaintiffs allege that Oakman: (a) knew or should have known about a pattern of excessive force and disproportionate use of force against African Americans by KCKPD officers; (b) failed to adequately train and supervise officers, including Schuler, on constitutional limits on deadly force and proper firearm use; (c) maintained or continued informal customs that undermined official policies, such as permitting officers to disregard "8 Can't Wait," the force continuum, and written lethal-force restrictions; and (d) ratified Schuler's conduct in this case by treating the shooting as justified and taking no corrective action. Plaintiffs contend that Oakman's supervisory actions and omissions set in motion and allowed Schuler's unconstitutional conduct to occur, proximately causing Decedent's death and Plaintiffs' damages.

**State-Law Negligence: Decedent (Against Defendant Schuler and the Unified Government).** Plaintiff Johnson, individually and as heir at law of Decedent, asserts state-law negligence claims arising from Decedent's death against Defendant Schuler and, under respondeat superior and the Kansas Tort Claims Act, K.S.A. § 75-6103, against the Unified Government. Johnson contends that Schuler, as a KCKPD officer, owed mandatory, nondiscretionary duties to Decedent to avoid the use of excessive force, to comply with KCKPD lethal-force and firearms policies, and to refrain from escalating encounters without sufficient justification. Johnson alleges that Schuler breached these duties by: (a) firing his weapon from a moving vehicle; (b) using deadly force during what was, at most, a misdemeanor fleeing situation based on a minor traffic stop; (c) using lethal force when lesser alternatives were available and practical, including simply allowing the vehicle to

move and employing later apprehension; (d) leaping onto Decedent's moving vehicle and thereby impermissibly escalating the encounter; and (e) firing into the vehicle despite the presence of an innocent passenger, Hill. Johnson alleges that these acts and omissions violated nondiscretionary duties imposed by KCKPD policy, were not shielded by discretionary immunity, and were a direct and proximate cause of Decedent's death and Plaintiff Johnson's damages, including wrongful death damages under K.S.A. 60-1901 et seq.

**State-Law Negligence/Negligent Infliction of Emotional Distress: Plaintiff Hill (Against Defendant Schuler and the Unified Government).** Plaintiff Hill asserts state-law negligence and negligent infliction of emotional distress claims against Defendant Schuler and, under respondeat superior and the Kansas Tort Claims Act, against the Unified Government. Plaintiffs contend that Schuler owed a duty to protect nearby third persons like Hill from unreasonable and excessive force and from unreasonable risk of physical harm during law-enforcement encounters. Hill alleges that Schuler breached this duty by the same negligent and reckless conduct described above including leaping onto the moving vehicle, firing into the passenger compartment from a moving vehicle, using deadly force when lesser alternatives existed, and doing so despite knowing that Hill was seated next to Decedent. Hill alleges that, as a direct and proximate result of Schuler's conduct and Decedent's shooting death occurring inches from Hill, Hill suffered severe emotional distress, including PTSD, anxiety, depression, sleeplessness, and other mental and emotional harms. Hill contends Schuler's acts were non-discretionary, outside the

scope of any statutory immunity, and that the Unified Government is liable for his negligence and reckless conduct.

**Wrongful Death: Plaintiff Johnson (Against All Defendants).** Plaintiff Johnson, as the mother and statutory heir of Decedent, asserts a wrongful-death claim under the Kansas Wrongful Death Act, K.S.A. 60-1901 et seq., against all Defendants based on the same underlying conduct that forms the basis of her federal and state-law claims. Johnson contends that Decedent's death was caused by the wrongful acts and omissions of Defendants, including Schuler's unconstitutional and negligent use of deadly force, Oakman's supervisory and policy-level failures, and the Unified Government's policies, practices, customs, and failures in training and supervision, and that Decedent would have had claims against Defendants had he survived. Johnson seeks all recoverable pecuniary and non-pecuniary wrongful-death damages available under Kansas law, including but not limited to loss of society, companionship, comfort, filial care, bereavement, mental anguish, and financial and support-related damages, as well as punitive damages where permitted.

**Abandoned or Dismissed Claims.** At this time, Plaintiffs do not abandon any claims asserted in their First Amended Complaint. Plaintiffs reserve the right to narrow or abandon claims as appropriate in light of future rulings or evidentiary developments, but, as of the date of this pretrial order, all theories summarized above remain in the case. The following claims have been dismissed: In a Memorandum and Order (ECF No. 42) filed on March 22, 2025, the Court granted Defendant UG's Partial Motion to Dismiss (ECF No. 9), and Denied Plaintiffs' Motion to Dismiss partial Count II (ECF No. 14) as moot,

which dismissed the following claims: Claims against the Kansas City, Kansas Police Department and Punitive damages claims against Defendant UG.

### b. Defendants' Defenses.

Defendants assert the following defenses:

**42 U.S.C. § 1983: Excessive Force/Unreasonable Seizure and State-Created Danger (Against Defendant Schuler in His Individual Capacity).** Plaintiff Pauletta Johnson asserts a federal civil-rights claim under 42 U.S.C. § 1983 against Defendant Officer Austin Schuler, in his individual capacity, for allegedly violating Decedent's Fourth and Fourteenth Amendment rights. Johnson lacks legal standing to assert direct claims on Henderson's behalf. No estate has been created, and Ms. Johnson has not been appointed as an executor.

Defendants contend that Schuler used objectively reasonable and proper use of deadly force in response to an immediate threat of death and/or serious bodily harm caused by Henderson.

Officer Schuler attempted less intrusive and safer alternatives to stopping the vehicle when he ordered that Henderson stop the vehicle himself. Henderson clearly chose to continue driving the vehicle and chose to escalate the situation. Officer Schuler's actions, including the action of remaining on the vehicle and subsequently firing his weapon, were precipitated by Henderson's escalating actions during the traffic stop – namely refusing to exit the vehicle and fleeing from the scene.

Officer Schuler is protected by qualified immunity due to his reasonable reaction to the immediate threat to safety that Henderson posed at the time of Henderson starting the

vehicle, driving away and Henderson's continued driving after being ordered to stop. Schuler's actions were not in contravention of any clearly established law. Henderson, by refusing to exit the vehicle and fleeing the scene, was attempting to evade arrest by flight. Thus, the totality of the circumstances justified Officer Schuler's use of force and Officer Schuler is protected by qualified immunity.

**42 U.S.C. § 1983: Municipal and Official-Capacity Liability (Against the Unified Government and Defendant Oakman in His Official Capacity).** Plaintiff Johnson and Plaintiff Hill assert § 1983 claims against the Unified Government of Wyandotte County/Kansas City, Kansas and against Chief Karl Oakman in his official capacity, based on policies, practices, customs, and failures in training, supervision, discipline, and ratification that allegedly were the moving force behind the asserted violation of Decedent's constitutional rights. Johnson lacks legal standing to assert direct claims on Henderson's behalf.  No estate has been created, and Ms. Johnson has not been appointed as an executor.

Plaintiffs have failed to develop evidence of a municipal policy, custom or procedure adopted by a final policy maker for the Unified Government that caused the Constitutional injuries claimed by Plaintiffs. Plaintiffs have not identified any written policy which it claims was the direct cause of Plaintiffs' injuries. Plaintiffs have further failed to identify any established pattern of Constitutional violations sufficiently similar to the facts of the present cause to put the Unified Government on notice that changes were

needed in policies, training or disciplinary practice and further demonstrating that the Unified Government was deliberately indifferent to the need for such changes.

Additionally, Plaintiffs claims must fail as Plaintiffs have not established that the conduct of the individual officers who interacted with Henderson, Hill and/or Johnson engaged in conduct which constitutes a Constitutional violation. The Unified Government cannot be liable if the underlying conduct of its officers did not constitute a Constitutional violation.

Finally, Plaintiffs' claims against Oakman in his official capacity are duplicative of their direct claims against the Unified Government and the official capacity claims should be dismissed.

**42 U.S.C. § 1983: Use of Excessive Force/Supervisory Liability (Against Defendant Oakman in His Individual Capacity).** Plaintiff Johnson and Plaintiff Hill assert an individual-capacity supervisory-liability claims under 42 U.S.C. § 1983 against Chief Oakman. Plaintiffs contend that Oakman, as KCKPD Chief of Police and Schuler's supervisor, personally participated in, directed, encouraged, and/or acquiesced in the constitutional violations alleged.

Oakman did not exercise sufficient supervisory control over Officer Shuler or the other officers on scene sufficient to form the basis for a failure to supervise claim during the incident in question. Oakman did not direct Schuler or the other officers on scene to take the actions that they took which Plaintiffs' claim resulted in their rights. Oakman did not set in motion any series of acts by subordinates which Oakman could reasonably know would cause Plaintiffs' claimed Constitutional injuries. Oakman didn't personally

participate in or contemporaneously order the specific use of force in question. Oakman's post-incident review of the investigation file and conclusions as to discipline did not form the basis of nor did it cause the Plaintiffs' injuries in this case.

Oakman is additionally entitled to qualified immunity associated with Plaintiffs' claims in this case as none of his challenged conduct was in violation of any clearly established law. Oakman acted with objective reasonableness under the circumstances then existing, and his conduct was justified and/or privileged and/or protected by the qualified immunity doctrine.

**State-Law Negligence: Decedent (Against Defendant Schuler and the Unified Government).** Plaintiff Johnson asserts a state-law negligence claim arising from Decedent's death against Defendant Schuler and, under respondeat superior and the Kansas Tort Claims Act, K.S.A. § 75-6103, against the Unified Government. Johnson lacks legal standing to assert direct claims on Henderson's behalf. No estate has been created and Ms. Johnson has not been appointed as an executor.

Johnson's state law claims and damages are barred and/or limited by the Kansas Tort Claims Act at K.S.A. 75-6101, et seq., including K.S.A. 75-6104(a)(3),(4),(5),(14) and K.S.A. 75-6105. Johnson's damages are further limited by K.S.A. 60-19a02.

Officer Schuler, as discussed, *supra*, engaged in reasonable use of deadly force in accordance with KCKPD policies because he was in reasonable fear of death or serious bodily harm due to Henderson's active flight from the scene. As Schuler testified, the initial encounter between the parties was reasonable. It was not until Henderson and Hill were asked to exit the vehicle that Henderson escalated the situation by refusing to

exit. Officer Schuler repeatedly used verbal requests of compliance before attempting to extract Henderson. Again, Henderson escalated the situation by starting the car after Schuler ordered him not to. As the officer was within the vehicle, Henderson again escalated the situation by refusing to stop the vehicle after Schuler repeatedly ordered him to. At the time Officer Schuler discharged his weapon at Henderson's body, he had sufficient justification to do so.

Johnson's claims are limited or barred by Henderson's conduct and if Johnson has suffered any damages, then the damages are a direct result of his own conduct and not the conduct of these answering Defendants and the fault of the Henderson should be compared.

As Officer Schuler acted as a governmental employee within the scope of employment, he is protected by a state law exception for discretionary functions. This remains the case whether or not the discretion is abused and regardless of the level of discretion involved. Officer Schuler, as a part of his duty as an officer, must frequently utilize his personal discretion when enforcing the law. In this instance, Officer Schuler used his discretion when taking action to protect from loss of life or serious bodily harm caused by Henderson's actions.

Similarly, the Unified Government, as a municipality, is protected by this same discretionary function exception.

**State-Law Negligence/Negligent Infliction of Emotional Distress: Plaintiff Hill (Against Defendant Schuler and the Unified Government).**

Plaintiff Hill asserts a state-law negligence claim arising from Decedent's death against Defendant Schuler and, under respondeat superior and the Kansas Tort Claims Act, K.S.A. § 75-6103, against the Unified Government. Hill's state law claims and damages are barred and/or limited by the Kansas Tort Claims Act at K.S.A. 75-6101, et seq., including K.S.A. 75-6104(a)(3),(4),(5),(14) and K.S.A. 75-6105. Plaintiffs' damages are further limited by K.S.A. 60-19a02.

Officer Schuler, as discussed, *supra*, engaged in reasonable use of deadly force in accordance with KCKPD policies because he was in reasonable fear of death or serious bodily harm due to Henderson's active flight from the scene. As Schuler testified, the initial encounter between the parties was reasonable. It was not until Henderson and Hill were asked to exit the vehicle that Henderson escalated the situation by refusing to exit. Officer Schuler repeatedly used verbal requests of compliance before attempting to extract Henderson. Again, Henderson escalated the situation by starting the car after Schuler ordered him not to. As the officer was within the vehicle, Henderson again escalated the situation by refusing to stop the vehicle after Schuler repeatedly ordered him to. At the time Officer Schuler discharged his weapon at Henderson's body, he had sufficient justification to do so.

Hill's claims are limited or barred by Henderson's conduct and if Hill has suffered any damages, then the damages are a direct result of his own conduct and not the conduct of these answering Defendants and the fault of the Henderson should be compared.

27

As Officer Schuler acted as a governmental employee within the scope of employment, he is protected by a state law exception for discretionary functions. This remains the case whether or not the discretion is abused and regardless of the level of discretion involved. Officer Schuler, as a part of his duty as an officer, must frequently utilize his personal discretion when enforcing the law. In this instance, Officer Schuler used his discretion when taking action to protect from loss of life or serious bodily harm caused by Henderson's actions.

Similarly, the Unified Government, as a municipality, is protected by this same discretionary function exception.

Additionally, Plaintiff Hill asserts a claim of negligent infliction of emotional distress claim against Defendant Schuler and, under respondeat superior and the Kansas Tort Claims Act, against the Unified Government. This Negligent Infliction of Emotional Distress claim must fail because under state law they may only be brought by immediate members of the family, which Plaintiff Hill is not.

**Wrongful Death: Plaintiff Johnson (Against All Defendants).** Plaintiff Johnson asserts a wrongful-death claim under the Kansas Wrongful Death Act, K.S.A. 60-1901 et seq., against all Defendants based on the same underlying conduct that forms the basis of her federal and state-law claims. Johnson lacks legal standing to assert direct claims on Henderson's behalf. No estate has been created, and Ms. Johnson has not been appointed as an executor. Johnson's state law claims and damages are barred and/or limited by the Kansas Tort Claims Act at K.S.A. 75-6101, et seq., including K.S.A. 75-

6104(a)(3),(4),(5),(14) and K.S.A. 75-6105. Plaintiffs' damages are further limited by K.S.A. 60-19a02.

Johnson's claims are limited or barred by Henderson's conduct and if Johnson has suffered any damages, then the damages are a direct result of his own conduct and not the conduct of these answering Defendants and the fault of the Henderson should be compared.

As Defendants argue, *supra*, Oakman did not fail to supervise Officer Schuler nor did he participate in a policy or practice of failure to train or supervise other officers at the KCKPD. Nor did the Unified Government's policies and practices, create a history of failure to train and supervise officers.

Under state law, Plaintiff Johnson cannot claim impairment of services, as that claim is reserved for spouses. The right of action to recover damages for such loss or impairment shall vest solely in a married person who, through the wrong of another, had their spouse sustain personal injuries causing the loss or impairment of his or her ability to perform services in the household.

**Other Defenses**

1.    Any state law claims are limited or barred due to Plaintiffs' failure to properly plead compliance with and/or to comply in fact with the requirements of K.S.A. 12-105b.

## 5.    DAMAGES AND NON-MONETARY RELIEF REQUESTED.

***Plaintiff Pauletta Johnson (Wrongful Death, Survival Action, § 1983 Claims)***: Plaintiff Pauletta Johnson, as heir at law of Decedent Amaree'ya Henderson and in her individual

capacity, seeks the following damages from Defendants Schuler, Unified Government, and

Oakman (where applicable):

1.  State Wrongful Death Claim: Sought from Schuler and UG

    a.  Funeral and burial expenses: $5,148.

    b.  Loss of financial support and wages contributed by Decedent: $934,765.

    c.  Loss of household/family services to Plaintiff Johnson: $967,236.

    d.  Emotional anguish and mental distress: $1,567,500, or the highest amount
        determined by the jury.

    e.  Loss of society, companionship, comfort, and protection: Plaintiff seeks the
        highest amount determined by the jury.

2.  State Survival Action Damages: Sought from Schuler and UG

    a.  Decedent's conscious pain and suffering prior to death: Plaintiffs seek the
        highest amount determined by a jury.

    b.  Decedent had no medical expenses known to Plaintiffs.

3.  Federal Civil Rights Damages (42 U.S.C. § 1983): Sought from Schuler, UG, and
    Oakman

    a.  Loss of financial support and wages contributed by Decedent: $934,765.

    b.  Loss of household/family services to Plaintiff Johnson: $967,236.

    c.  Emotional anguish and mental distress of Johnson: $1,567,500, or the highest
        amount determined by the jury.

    d.  Loss of society, companionship, comfort, and protection: Plaintiff seeks the
        highest amount determined by the jury.

4.  State Law Negligence: Sought from Schuler and UG

    a.  Plaintiff seeks the same categories of damages listed under the wrongful-death and survival claims to the extent allowed under Kansas law.

5.  Lost Wages for Plaintiff Johnson: sought from Schuler and UG

    a.  Past lost wages: $28,500.

    b.  Reduced future earning capacity: $1,596,000 or an amount determined by the jury based on expert testimony and wage records.

**Plaintiff Shakira Hill (Negligence, § 1983)**

Plaintiff Shakira Hill seeks the following damages from Defendants Schuler and UG:

1.  State Negligent Infliction of Emotional Distress Claim: Sought against Schuler and the UG

    a.  Past emotional distress damages, including trauma from witnessing the shooting at close proximity: an amount not less than $1,369,500.

    b.  Future emotional distress damages, including PTSD-related symptoms, anxiety, depression, and ongoing impairment: the highest amount determined by the jury.

    c.  Past and future mental-health treatment costs: Past mental-health treatment: $1,210. Future mental health treatment is unknown and subject to expert testimony.

    d.  Past Lost Wages: $11,200.

2.  Federal Civil Rights Damages (42 U.S.C. § 1983), Sought from Schuler and UG

    a.  Past emotional distress damages, including trauma from witnessing the shooting at close proximity: an amount not less than $1,369,500.

    b.  Future emotional distress damages, including PTSD-related symptoms, anxiety, depression, and ongoing impairment: the highest amount determined by the jury.

    c.  Past and future mental-health treatment costs: Past mental-health treatment: $1,210. Future mental health treatment is unknown and subject to expert testimony.

    d.  Past Lost Wages: $11,200.

### *Punitive Damages*

Plaintiffs further seek punitive damages against Defendants Schuler and Oakman, in their individual capacities only, for reckless or callous disregard of federally protected rights. Plaintiffs seek the highest amount as determined by a jury.

### *Attorneys' Fees and Costs*

Plaintiffs seek reasonable attorneys' fees and costs under 42 U.S.C. § 1988, including: partner billing at $1,250 per hour, associate billing at $850 per hour, and the cost of all reasonable litigation costs, expert fees, and expenses with a total amount to be determined based on the hours reasonable expended at the time of judgment.

### *Defendants' Defenses - Punitive Damages*

Plaintiffs are not entitled to any punitive damage award against Defendants for any one or more of the following reasons:

a.      The standards by which Defendants' conduct is to be determined as alleged by Plaintiffs are vague and wholly arbitrary and, as such, deny due process in violation of the Fifth and Fourteenth Amendments of the United States Constitution;

b.      The standards for determining the amount and/or subsequent imposition of punitive damages are vague, supply no notice to Defendants of the potential repercussions of their alleged conduct and are subject to the unbridled discretion of the fact finder, thereby denying due process in violation of the Fifth and Fourteenth Amendments of the United States Constitution;

c.      Plaintiffs' request for punitive damages is criminal in nature and the rights given defendants in criminal proceedings under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution are applicable;

d.      Plaintiffs' request for punitive damages constitutes cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution;

e.      Plaintiffs' request for punitive damages constitutes a request for and/or imposition of excessive fines in violation of the Eighth Amendment of the United States Constitution;

f.      Plaintiffs' request for punitive damages constitutes a denial of equal protection of the law in violation of the Fifth and Fourteenth Amendments of the United States Constitution in that defendant's wealth or net worth may be considered by a fact finder in determining the award of damages in a punitive damages award;

g.      Plaintiffs' request for punitive damages cannot protect Defendants against multiple punishments for the same alleged wrong, thereby denying due process under the Fifth and Fourteenth Amendments of the United States Constitution;

h.      An award of punitive damages would violate Defendants' due process under the United States Constitution as well as in violation of the United States Supreme Court's decision in *Pacific Mutual Insurance Co. v. Haslip*;

i.      To the extent Defendants are being sued for tort claims under state law, punitive damages against governmental entities are prohibited and/or barred by the Kansas Tort Claims Act;

j.      Plaintiffs' claims for punitive damages under 42 U.S.C. 1983 against the Unified Government are precluded under the *Facts Concert* case.

***Defendants' Attorneys' Fees and Costs***

Defendant seeks its reasonable attorneys' fees and costs under 42 U.S.C. § 1988, and the cost of all reasonable litigation costs, expert fees, and expenses.

**6.      AMENDMENTS TO PLEADINGS.**

None.

**7.      DISCOVERY.**

Under the scheduling order and any amendments, all discovery was to have been completed by November 11, 2025. Discovery is complete.

Unopposed discovery may continue after the deadline to complete discovery so long as it does not delay briefing or ruling on dispositive motions or other pretrial preparations. Although discovery may be conducted beyond the deadline to complete discovery if all parties agree to do so, under these circumstances the court will not be available to resolve any disputes that arise during the course of such extended discovery.

**8.     MOTIONS.**

**a.     Pending Motions.**

None.

**b.     Additional Pretrial Motions.**

After the pretrial conference, the parties intend to file the following motions:

1.   Daubert Motions by Plaintiffs and Defendants.

2.   Motions in limine by Plaintiffs and Defendants.

3.   Motion for Summary Judgment by Defendants.

The dispositive-motion deadline, as established in the scheduling order and any amendments, is **December 18, 2025**. The parties should follow the summary-judgment guidelines on the court's website:

*http://ksd.uscourts.gov/wp-content/uploads/2015/10/Summary-Judgment-Guidelines.pdf*

Principal briefs in support of, or in response to, summary judgment motions must not exceed 40 pages and replies must not exceed 15 pages. *See* D. Kan. Rule 7.1(d)(2). Any motion to exceed these page limits or for an extension of briefing deadlines must be filed at least three days before the brief's filing deadline. *See* D. Kan. Rule 6.1(a), 7.1(d)(4).

**c.     Motions Regarding Expert Testimony.**   All motions to exclude the testimony of expert witnesses pursuant to Fed. R. Evid. 702-705, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), or similar case law, must be filed in accordance with the dispositive-motion deadline stated above.

9.    **TRIAL.**

The trial docket setting, as established in the scheduling order and any amendments, is **September 1, 2026, at 9:00 a.m., in Kansas City, Kansas**. This case will be tried by jury. Trial is expected to take approximately 5 days. The court will attempt to decide any timely filed dispositive motions approximately 60 days before trial. If no dispositive motions are timely filed, or if the case remains at issue after timely dispositive motions have been decided, then the trial judge may enter an order or convene another pretrial conference to set deadlines for filing final witness and exhibit disclosures, exchanging and marking trial exhibits, designating deposition testimony for presentation at trial, motions in limine, proposed instructions in jury trials, and proposed findings of fact and conclusions of law in bench trials.

10.    **ALTERNATIVE DISPUTE RESOLUTION (ADR).**

The status of settlement negotiations is as follows: The parties are actively negotiating settlement. The parties currently believe the prospects for settlement of this case are fair and they do not believe that further court-ordered ADR would be helpful.

The parties are reminded that, under D. Kan. Rule 40.3, they must immediately notify the court if they reach an agreement that resolves the litigation as to any or all parties. Jury costs may be assessed under this rule if the parties do not provide notice of settlement to the court's jury coordinator at least one full business day before the scheduled trial date.

IT IS SO ORDERED.

Dated November 25, 2025, at Wichita, Kansas.


<u>s/ Gwynne E. Birzer</u>
GWYNNE E. BIRZER
U. S. Magistrate Judge

Respectfully submitted,

<u>*Nuru Witherspoon*</u>
Nuru Witherspoon
Kay Harper Williams
*Admitted Pro Hac Vice*
**THE WITHERSPOON LAW GROUP, PLLC**
5565 Deer Creek, Unit A
Dallas Texas 75228
witherspoon@twlglawyers.com
Williams@twlglawyers.com
Taylor@twlglawyers.com
litigation@twlglawyers.com


and
<u>*/s/ Suzanne Hale Robinson*</u>
Suzanne Hale Robinson, KS Bar #27070
**HALE ROBINSON & ROBINSON, LLC**
511 Delaware St. Suite 100
Kansas City, MO 64105
(913) 709-1788
F: (816) 246-1500
Suzanne@hrrlawyers.com
*Attorneys for Plaintiffs*


<u>*/s/ Kathryn M. Dumovich*</u>
Kathryn M. Dumovich
kdumovich@mvplaw.com
Ryan B. Denk
rdenk@mvplaw.com
**MCANANY, VAN CLEAVE & PHILLIPS, P.A.**
10 E. Cambridge Circle Drive, Suite 300
Kansas City, Kansas 66103.
*Attorneys for Defendants*

37